UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
APPLE IPHONE PROPERTY CODE
STICKER CS717195

Misc. No. _____

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
### RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Theodore Schmitz**,** being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property—a digital

device—which is currently in law enforcement possession, and the extraction from that property

of electronically stored information as described in Attachment B.

2.      I am a Special Agent of the U.S. Department of Homeland Security, Homeland

Security Investigations ("HSI") and am currently assigned to the Office of Professional

Responsibility, Special Investigations Unit.  I have served in the United States Customs Service

and HSI since December 1997, and have successfully completed criminal investigator training at

the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia where I was trained

in criminal investigative techniques.  In August of 2015, I attended FLETC again and completed

a  two  week  class  on  conducting  internal  investigations  for  the  Office  of  Professional

Responsibility. I have knowledge of the laws and regulations relating to the money laundering,

narcotic smuggling, human smuggling, child exploitation, and the illegal exportation of weapons,

technology, and other controlled commodities.  I am empowered by law to investigate and make arrests for violations of federal law, including assault resulting in serious bodily injury.

3.      Your affiant is authorized to conduct investigations of suspected criminal violations of various federal laws, including laws associated with assaults resulting in serious bodily injury. HSI Special Agents are authorized under statutory authority to apply for and execute arrest and search warrants.

4.      Your affiant personally participated in the investigation of the offenses referred to in this affidavit and has witnessed many of the facts and circumstances underlying this investigation.  In addition, the statements contained in this affidavit are based on reliable information provided to the affiant by other law enforcement agents and cooperating witnesses, as well as official documents and reports reviewed in furtherance of the investigation.  In addition, all witness statements are set forth in part and in substance unless otherwise indicated.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      This affidavit is submitted in support of a search warrant alleging violations that an HSI employee violated Title 18 U.S.C. 113, Assaults within maritime and territorial jurisdiction, which makes it unlawful to assault another in the special maritime and territorial jurisdiction of the United States.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is an Apple iPhone, HSI property code sticker CS717195,  hereinafter the "Device."

2

8.     The Device is currently located at the Office of Professional Responsibility, 950 L'Enfant Plaza, SW, Washington, DC, 20024.

## **PROBABLE CAUSE**

9.     On July 22, 2017, HSI Special Agent (SA) Richard Mosquera, assigned to the United States Embassy, Guatemala City, Guatemala, self-reported to Department of State, United States Embassy, Guatemala, Regional Security Officer (RSO) Michael Malamud that he had a physical altercation with his wife and she was injured.  SA Mosquera's assault of his wife took place in the parking garage of SA Mosquera's residence, which is was being provided by the United States Government while he was assigned to the U.S. Embassy in Guatemala, and therefore is within the special maritime and territorial jurisdiction of the United States.  SA Mosquera notified RSO Malamud from his government issued cell phone, which bears the telephone number 31139655, that he had a physical altercation with his wife and she sustained substantial bodily injury.

10.     Specifically, on July 22, 2017, SA Mosquera struck his wife in the face with his hand, causing a severe laceration to her upper lip.  SA Mosquera's wife required medical treatment from the injuries she sustained as a result of the assault by SA Mosquera.  Paramedics were called to SA Mosquera's residence, and his wife was transported to Hospital Herrera Llerandi in Guatemala City, Guatemala.  SA Mosquera's wife required over ten stiches to her upper lip to repair the injury caused by SA Mosquera.

11.     On July 22, 2017, SA Mosquera called HSI Foreign Service National Investigator (FSNI) Victor Cruz from cell phone number 31139655 and reported to FSNI Cruz that Mosquera's

wife had been in an accident. A forensic exam conducted on FSNI Cruz's cell phone with FSNI Cruz's consent, showed eleven (11) calls between FSNI Cruz and SA Mosquera on July 22, 2017, after SA Mosquera assaulted his wife.  FSNI Cruz stated all eleven (11) calls were concerning the injuries sustained by SA Mosquera's wife.  FSNI Cruz stated the calls between himself and SA Mosquera occurred after SA Mosquera inflicted the injury to his wife, when FSNI Cruz was at the hospital with SA Mosquera's wife.  FSNI Cruz was in contact with SA Mosquera to keep SA Mosquera informed of his wife's condition.

12.     FSNI Cruz's cellular phone was forensically analyzed with FSNI's consent by SA Patricia Grinion.  The forensic exam of FSNI Cruz's cell phone showed three (3) contact numbers for SA Mosquera, two (2) of which were for mobile phone number 31139655 and one (1) of which was for home number (305) 842-0257.

13.     FSNI Cruz reported that he was also in contact with SA Mosquera through WhatsApp, which is a freeware and cross-platform instant messaging service for smartphones, on July 22, 2017.  The forensic exam of FSNI Cruz's cell phone had a data file for phone number 311396555 from FSNI Cruz's WhatsApp account and a photograph of SA Mosquera.  Below is the WhatsApp photo FSNI Cruz had for SA Mosquera.



14.     FSNI Cruz stated that on July 22, 2017, he was also in contact with SA Mosquera via WhatsApp to keep SA Mosquera informed of Mosquera's wife's condition.  FSNI Cruz had deleted the WhatsApp conversation with SA Mosquera from July 22, 2017.

15.     FSNI Cruz stated he only had one cell phone number, 31139655, for SA Mosquera and that phone number was for SA Mosquera's work cell phone.

16.     On July 27, 2017, I seized the government issued cell phone assigned to SA Mosquera with HSI property code sticker CS717195.  When I seized the cell phone from SA Mosqera, it was in a red Mophie case.

17.     I have reviewed a surveillance video of the July 22, 2017, incident between SA Mosquera and his wife in the parking garage of their residence in Guatemala City, Guatemala. Immediately after the incident, SA Mosquera used a cell phone with a red case.  In the video, I observed SA Mosquera using a cell phone to make phone calls and send text messages.

18.     I have reviewed emails sent by SA Mosquera and his signature line has his cell phone listed as 011(502)3113-9655.  Below is a copy of his signature line:

Richard E. Mosquera

U.S. Department of Homeland Security

ICE - Homeland Security Investigations

Mobile: 011(502)3113-9655

Email: richard.e.mosquera@ice.dhs.gov.

19.     Based on the foregoing, there is probable cause to believe that SA Mosquera's cell phone may contain evidence of criminal activity surrounding the altercation between SA Mosquera and his wife on July 22, 2017, in violation of Title 18 U.S.C. 113, Assaults within maritime and territorial jurisdiction.  The types of evidence that may be found on SA Mosquera's cell phone are texts, emails, WhatsApp conversations, and photographs describing and/or depicting the physical altercation between SA Mosquera and his wife.  From reviewing the video of SA Mosquera in the parking garage after the assault it is not known who else SA Mosquera was in contact with that evening or the next day.  These are possible witnesses that would need to be interviewed concerning the assault by SA Mosquera.

20.     The Device is currently in the lawful possession of the Office of Professional Responsibility and stored at 950 L'Enfant Plaza, SW, Washington, DC 20024.

21.     The Device came into HSI's possession in the following way:  On July 27, 2017, I seized the government cell phone assigned to SA Mosquera with HSI property code sticker CS717195 at U.S. Immigration and Customs Headquarters, 500 12th Street, SW, Washington, DC 20536, and placed into evidence.  Therefore, HSI might already have all necessary authority to examine the Device; however, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

## **TECHNICAL TERMS**

22.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such

as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a

string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   d.  "Computer software" means digital information that can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

   e.  Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   f.  The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

h.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

i.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

10

8.      Based on my training, experience, and research, I know that the Device, ZTE Cell phone, serial number 329F7426531A, has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

9.      As described above and in Attachment B, this application seeks permission to search for information that might be found within the Device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

a.      Individuals who engage in criminal activity, including domestic violence abuse and related crimes use digital devices, like the Device, to store images, videos or documents and records relating to their illegal activity, which can include logs of online "chats"; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts. Digital devices, like the Device, are used by individuals who engage in criminal activity to communicate with victims and are a means to facilitate the criminal activity.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to

11

that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

10.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

      a.   Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the

times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.

14

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.    I know that when an individual uses a digital device to facilitate or memorialize a crime, including taking photographs of the abuse or injuries or sending messages to the victim or other witnesses related to the assault, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime if it is used as a means of facilitating the commission of the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime, including such images or messages.  From my training and experience, I believe that a digital device used to as a medium to communicate about a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it, including potentially photographs and messages regarding the crime.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

11.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of

16

particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by

17

the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio

application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

   f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

   g. In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

    1. The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

    2. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a

drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.   In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

12.   Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

13.     I respectfully submit that this affidavit supports probable cause for a warrant to search the Apple iPhone, HSI property code sticker CS717195, described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____
Andrea L. Hertzfeld
Assistant United States Attorney

_____
Theodore Schmitz
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on ____ day of October, 2017

_____
JUDGE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE